**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KATY L. MUNOZ MARTINEZ,　　　　)
　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiff,　　)　　　Civil Action No. 12-18 Erie
　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　)
　　　　　　　　　　　　　　　)
MICHAEL J. ASTRUE,　　　　　　)
Commissioner of Social Security,　)
　　　　　　　　　　　　　　　)
　　　　　　　　　Defendant.　　)

**<u>MEMORANDUM OPINION</u>**

McLAUGHLIN, SEAN J., District Judge.

## I.　　INTRODUCTION

　　　　Katy L. Munoz Martinez ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.*  Plaintiff filed her applications on April 23, 2009 alleging disability since February 17, 2007 due to bipolar disorder, hypertension, scoliosis, degenerative disc disease, and migraine headaches (AR 106-112; 136).[1]  Her applications were denied (AR 73-76), and following a hearing held on June 16, 2010 (AR 29-56), the administrative law judge ("ALJ") issued his decision denying benefits to Plaintiff on July 29, 2010 (AR 16-25).  Plaintiff's request for review by the Appeals Council was subsequently denied (AR 1-5), rendering the Commissioner's decision final under 42 U.S.C. § 405(g).  The instant action challenges the ALJ's decision.  Presently pending before the Court are the parties' cross-motions for summary judgment.  For the following reasons, both motions will be denied and the matter will be remanded to the Commissioner for further proceedings.

---

[1] References to the administrative record [ECF No. 7], will be designated by the citation "(AR ___)".

II.   **BACKGROUND**

Plaintiff was 30 years old on the date of the ALJ's decision and has a high school education (AR 24).  She has past relevant work experience as a press operator and set-up operator (AR 24).

The medical records reveal that Plaintiff was seen by Dorene Morris, D.O., her primary care physician, on June 29, 2007 for complaints of headaches and low back pain (AR 479).  An MRA of Plaintiff's head dated September 10, 2007 was reported as normal (AR 208).  An MRI of Plaintiff's lumbar spine dated December 6, 2007 revealed multilevel degenerative changes, and a broad based disc herniation to the right of the midline at the L5-S1 level, with some mild effect on the left S1 traversing nerve root (AR 209).  No neural foramen or significant central canal stenosis was seen (AR 209).

On March 12, 2008, Plaintiff was evaluated by Marilyn Gushard, M.A., at the Pain Management Center upon referral by Dr. Morris (AR 203).  Plaintiff complained of low back pain with bilateral leg numbness (AR 203).  She stated that she was awaiting gastric bypass surgery, and had been diagnosed with bipolar disorder as an adolescent, but was not currently on medication (AR 204).  Plaintiff indicated that she last worked in February 2007 when her husband lost his job, but she had stopped working when he returned to work (AR 203).  Plaintiff informed Ms. Gushard that she was amenable to undergoing injection therapy and medication adjustments (AR 204).

On March 21, 2008, Plaintiff returned to the Center and was evaluated by Anna Searls, PA-C and Anthony Colantonio, M.D. (AR 201-202).  Plaintiff reported that she suffered from back pain and numbness in her legs that was not constant, but was exacerbated by any activity (AR 201).  She indicated that previous therapies had included medications prescribed by Dr. Morris, as well as physical therapy (AR 201).  She stated that heat, a warm bath or shower, and frequent position changes helped relieve her pain (AR 201).  Plaintiff's medications included Labetalol, Lexapro, Flexeril and Vicodin, which helped her pain (AR 201).  Plaintiff reported that she enjoyed walking, soccer and scrapbooking, but it was hard for her to work with her back problems (AR 202).  Ms. Searls noted that her most recent MRI in December 2007 showed a

disc herniation to the right of the midline at L5-S1 with mild effacement of the left SI traversing nerve root (AR 201).  On physical examination, Ms. Searls found Plaintiff had a limited range of motion with flexion to 90 degrees, but had a full range of motion on lateral rotation and extension (AR 202).  Palpable tenderness was present in the middle of Plaintiff's lumbar spine and radiated into her thoracic spine (AR 202).  Ms. Searls found Plaintiff's deep tendon reflexes were 2+ in the lower extremities, her sensory reflexes were equal bilaterally to vibration, and she had 5/5 motor strength (AR 202).  Ms. Searls reported that Plaintiff's straight leg raise testing was negative bilaterally, but Plaintiff reported some pulling into her back and she had a positive Patrick sign bilaterally (AR 202).  She diagnosed Plaintiff with intervertebral disc disease of the lumbar spine with radiculitis, and recommended she undergo a lumbar epidural injection (AR 202).  An epidural injection scheduled for April 17, 2008 was cancelled, however, due to Plaintiff's elevated blood pressure and questionable sinusitis (AR 277).

Plaintiff had laparaoscopic gastric bypass surgery on May 22, 2008 performed by Rodolfo Arreola, M.D. (AR 334-340).  Dr. Arreola reported that Plaintiff did well following surgery and she was subsequently discharged in stable condition (AR 335).  On December 18, 2008, Plaintiff had an epidural steroid injection administered by Dr. Colantonio (AR 297-298).

On January 29, 2009, Plaintiff was seen by Dr. Morris and reported suffering from headaches and a stiff neck (AR 194).  Plaintiff also reported low back pain but stated it was mild when she took Vicodin (AR 195).  Plaintiff's blood pressure was elevated to 177/121 on the right and 196/114 on the left, even though she had been compliant with her medication (AR 194).  Plaintiff's mother reported that she was concerned Plaintiff was bipolar because she had dramatic mood changes and sleep disturbances (AR 194).  Dr. Morris noted that Plaintiff complained of depression and was tearful throughout the examination (AR 195).  Plaintiff was admitted to the hospital for further evaluation due to her elevated blood pressure and headache complaints (AR 194).  Plaintiff's cervical spine X-rays dated January 29, 2009 were normal (AR 205).  An MRI of Plaintiff's cervical spine dated January 30, 2009 showed minor degenerative changes only, with minimal disc bulging at the mid cervical spine and no neural foramen or central canal stenosis (AR 207).  An MRI of Plaintiff's brain was normal (AR 187).

While hospitalized, Plaintiff was seen by Emmanuelle Duterte, M.D., a psychiatrist, pursuant to Dr. Morris' request (AR 284-286). Plaintiff reported a history of depression and bipolar disorder (AR 284). Plaintiff indicated that she had problems with impulsivity and anger while in her teens, and had taken an overdose resulting in inpatient mental health treatment for three days (AR 284). Plaintiff stated that she had been treated with various antidepressants in the past, but was not currently undergoing mental health treatment (AR 284). Plaintiff reported continued mood swings, increased irritability and angry outbursts, problems with energy and motivation, depression, and sleep disturbances (AR 284). She further reported episodes of elevated energy, racing thoughts, increased impulsivity and increased goal-oriented activities (AR 284). She denied any psychotic symptoms (AR 284).

On mental status examination, Dr. Duterte reported that Plaintiff was fully oriented, cooperative and pleasant, and had good eye contact (AR 285). She found that Plaintiff's mood was depressed and her affect was tearful and sad (AR 285). Her thought processes were logical, organized and goal directed, she denied having any hallucinations, paranoia, delusions, or suicidal thoughts, and her cognition was intact (AR 285). Dr. Duterte found her insight and judgment were fair and that her impulse control was adequate (AR 285). Dr. Duterte thought Plaintiff "possibly [had] bipolar disorder" and indicated that her Global Assessment of Functioning ("GAF") score appeared to be 50 to 55 (AR 286).[2] Dr. Duterte prescribed Abilify to stabilize her mood and recommended psychiatric follow up and individual psychotherapy (AR 286).

Upon discharge from the hospital, Plaintiff's headache had improved, her neck pain had resolved, and her back pain was "at baseline for her" (AR 188). Her blood pressure medications

---

[2]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 41 to 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* An individual with a GAF score of 51 to 60 may have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (e.g., no friends, conflicts with peers or co-workers)." *Id.*

were adjusted, she was advised to monitor her blood pressure at home and increase her medication if necessary, and she was instructed to follow up with psychiatry (AR 188).

Plaintiff returned to Dr. Morris on February 12, 2009 and reported that her neck pain was tolerable, and physical examination revealed pain on the right side of her neck (AR 282). Plaintiff reported that she was unable to afford the Abilify prescription (AR 282). On March 3, 2009, Plaintiff reported that her neck pain had improved, but complained of back pain and trouble sleeping (AR 280).

On March 4, 2009, Plaintiff was seen by Randy Zelen, M.D., following a "four year hiatus" for follow up with respect to her hypertension (AR 402-403). Plaintiff reported that she took Vicodin for her degenerative joint disease and denied any leg pain (AR 402). Physical examination of her lower extremities revealed 1+ pedal, trace presacral edema, but no clubbing cyanosis or calf tenderness (AR 403). Dr. Zelen noted that Plaintiff had significant peripheral edema, and discussed with her the importance of limiting her salt and water intake, and increased her Labetalol dosage (AR 403).

Plaintiff was seen by Dr. Duterte on March 5, 2009 and reported that she had not started the Abilify because she could not afford it (AR 267). She complained of mood instability, irritability, angry outbursts where she injured herself to avoid injuring others, depression, crying episodes, and sleep disturbances (AR 267). She also complained of racing thoughts and short periods of elevated energy (AR 267). She denied any suicidal thoughts or psychotic symptoms (AR 267). On mental status examination, Dr. Duterte reported that Plaintiff was alert, fully oriented, and cooperative with normal speech (AR 267). Her thought processes were logical, organized and goal-directed, and her cognition was intact (AR 267). Plaintiff described her mood as "depressed," and her affect was sad and tearful (AR 267). She denied having any hallucinations, paranoia, or delusions (AR 267). Dr. Duterte found that her insight and judgment were fair, and her impulse control was poor (AR 267). She diagnosed Plaintiff with bipolar disorder type II, assigned her a GAF score of 50, and prescribed Geodon, an anti-depressant (AR 267).

Plaintiff returned to Dr. Duterte on April 24, 2009 and reported that she had been unable to obtain the medications prescribed for her until she secured her Access card (AR 264).  She continued to complain of mood instability, irritability, agitation and angry "outbursts" (AR 264). Plaintiff reported that she became destructive and violent at times and had fleeting suicidal thoughts (AR 264).  She denied any current suicidal thoughts or psychotic symptoms (AR 264). On mental status examination, Dr. Duterte reported that Plaintiff was alert, fully oriented, cooperative and pleasant (AR 264).  She further reported that Plaintiff's speech was normal in rate and volume (AR 264).  Plaintiff described her mood as "unstable" and Dr. Duterte found that her affect was dysphoric[3] (AR 264).  She further found that Plaintiff's thought processes were logical, organized and goal-directed (AR 264).  She denied having any hallucinations, paranoia, and delusions, and her cognition was intact (AR 264).  Dr. Duterte found that her insight and judgment were fair and her impulse control was poor (AR 264).  She was diagnosed with bipolar disorder type II, assigned a GAF score of 55 and prescribed Geodon (AR 264).

Plaintiff returned to Dr. Morris on May 4, 2009 and reported an "episode" wherein she became angry with her husband for no reason (AR 275).  Plaintiff reported that Geodon made her feel "out of it" (AR 275).  She also complained of back pain, but reported that an epidural injection had helped (AR 275).  Dr. Morris reported that Plaintiff was tearful and anxious (AR 275).  Dr. Morris found Plaintiff's strength in her lower extremities was 5/5 bilaterally (AR 275). Plaintiff was assessed with chronic low back pain and referred for a physical therapy evaluation (AR 275).

Dr. Zelen reported on May 7, 2009 that Plaintiff looked and felt good and had no new complaints (AR 213).  Plaintiff reported no difficulties in motor strength, gait, sensation, level of consciousness, memory, concentration, mood affect or general thought processes (AR 213).  On physical examination, Dr. Zelen found that Plaintiff was in no acute distress, her cardiovascular and gastrointestinal examinations were unremarkable, and she had no edema in her lower

---

[3]Dysphoria is defined as a mood of general dissatisfaction, restlessness, depression and anxiety.  *Stedmans Medical Dictionary (27th ed. 2000).*

extremities (AR 213-214).  Dr. Zelen increased her Labetalol dosage, started her on Norvasc, and counseled her on weight control and regular exercise (AR 214).

Plaintiff returned to Dr. Duterte on May 29, 2009 and reported that Geodon made her feel "sedated" and that she had stopped taking it (AR 262).  She indicated that her outbursts had decreased over the past month while her husband had been gone (AR 262).  On mental status examination, Plaintiff described her mood as "not too bad" but "still not very stable," and Dr. Duterte found that her affect was "calmer" (AR 262).  Her remaining examination remained unchanged from April 24, 2009 (AR 262).  Dr. Duterte found that her insight and judgment were fair and her impulse control was "a little bit better" (AR 262).  She was diagnosed with bipolar disorder type II, assigned a GAF score of 55 and prescribed Abilify (AR 262).

On June 2, 2009, Plaintiff underwent a physical therapy evaluation for her complaints of low back pain (AR 274).  Plaintiff reported constant pain exacerbated by sitting or standing too long (AR 274).  She indicated that she was independent in her personal care, but was limited in walking, lifting, sitting, working, sleeping, and driving (AR 274).  The therapist found that Plaintiff had a decreased range of motion, poor posture, and decreased core strength impairing her functioning (AR 274).  Various treatment modalities were discussed for improving her flexibility and core strength (AR 274).

Plaintiff returned to Dr. Morris on June 8, 2009 and complained of ongoing back pain (AR 272).  Plaintiff claimed that she took six Vicodin a day and without them she ached and felt like she had the flu "all the time" (AR 272).  Plaintiff also reported that she had "punched [her] husband" and that Dr. Duterte had prescribed Abilify (AR 272).  On physical examination, Dr. Morris found Plaintiff had paraspinal muscle spasms in the lumbar sacrum area (AR 272).  Her sensation was equal to pin prick, and her reflexes were intact (AR 316).  Dr. Morris also found that Plaintiff was depressed (AR 272).

On June 9, 2009, Dr. Morris completed a Medical Source Statement relative to Plaintiff's ability to perform work-related physical activities (AR 270-271).  Dr. Morris opined that Plaintiff could occasionally lift and carry up to 25 pounds, stand for two to three hours in an 8-hour day, and sit for only two hours in an 8-hour day (AR 270).  She further opined that Plaintiff

could occasionally bend, kneel, stoop and crouch, but never balance or climb (AR 271).  Dr. Morris found that Plaintiff was limited in her reaching and handling abilities, but did not specify the nature or the degree of the limitation in these areas (AR 271).

X-rays of Plaintiff's lumbar spine dated June 16, 2009 revealed mild degenerative changes including spondylotic spurring and endplate bony sclerosis (AR 397).  An MRI of Plaintiff's lumbar spine revealed a broad based posterior disc herniation at the right paramedian location at the L5-S1 level, slightly displacing the traversing right S1 nerve root (AR 395).  The neural foramina were mildly encroached but no significant central canal stenosis was seen (AR 395).

On June 29, 2009, Plaintiff was seen by Dr. Duterte and reported an improvement in her symptoms since switching to Abilify (AR 260).  She stated she felt "calmer" although she still experienced anger episodes (AR 260).  She described her mood as "better" and Dr. Duterte found that her affect was calmer and her impulse control continued to improve (AR 260).  Her Abilify dosage was increased and she was assessed with a GAF score of 65 (AR 261).[4]

On July 15, 2009, Gregory Mortimer, M.D., a state agency reviewing physician, reviewed the medical evidence of record and opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for no more than three hours in an 8-hour workday; and sit for six hours in an 8-hour workday (AR 312).  He further opined that Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl (AR 313).  He felt she should avoid even moderate exposure to machinery and heights (AR 314).  Dr. Mortimer found that Plaintiff's complaints were only partially credible in light of the medical evidence of record (AR 317).  He found that Dr. Morris' limitations relative to Plaintiff's sitting, balancing and climbing abilities were not consistent with the medical and non-medical evidence in the record (AR 317).

On July 20, 2009, Edward Jonas, Ph.D., a state agency reviewing psychologist, reviewed the psychiatric evidence of record and determined that Plaintiff had mild limitations in

---

[4]An individual with a GAF score of 61 to 70 may have "mild symptoms (e.g., depressed mood and mild insomnia)" or "some difficulty in social, occupational, or school functioning … but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

completing activities of daily living and in maintaining concentration, persistence or pace, and had moderate difficulties in maintaining social functioning (AR 331). Dr. Jonas completed a Mental Residual Functional Capacity Assessment form and concluded that Plaintiff was moderately limited in her ability to maintain attention and concentration, and in her ability to work in coordination with others without being distracted (AR 318). He further found that Plaintiff was moderately limited in her ability to interact appropriately with the general public, accept instructions, respond appropriately to criticism from supervisors, get along with coworkers and maintain socially appropriate behavior (AR 319). Plaintiff was also moderately limited in her ability to respond to changes in the work setting and set realistic goals (AR 319). Dr. Jonas found Plaintiff had no limitations in her ability to ask simple questions or request assistance, or take appropriate precautions against normal hazards (AR 319).

Dr. Jonas noted that Plaintiff had only recently started her medications, which were in the process of being adjusted, but she showed some initial response (AR 320). He further noted that Plaintiff was not cognitively limited with her contacts, but was dysphoric and had conflicts with her husband (AR 320). Dr. Jonas found Plaintiff was capable of routine activities of daily living (AR 320). He observed that Plaintiff appeared to function as the primary caregiver to her children, was able to drive and was independent in the community (AR 320). He further found that her basic memory processes were intact and that she could make simple decisions (AR 320). Dr. Jonas noted that her frustration tolerance was low and she had a history of distractive behavior, but there were no restrictions in her abilities with regard to understanding and memory (AR 320). Finally, Dr. Jonas concluded that Plaintiff remained capable of meeting the basic mental demands of competitive work on a sustained basis (AR 320).

On July 24, 2009, Plaintiff was evaluated by Timothy Ward, M.D., an orthopedic surgeon, upon referral by Dr. Morris (AR 391). Plaintiff reported increased back pain with occasional bilateral leg numbness that was "not very significant or constant" (AR 391). On physical examination, Dr. Ward found that Plaintiff had a normal gait, normal motor, sensory and reflex examinations in both extremities, and her straight leg raise testing was negative bilaterally (AR 391). Dr. Ward observed that Plaintiff's lumbosacral spine films revealed

9

decreased disk height at L5-S1, and that an MRI showed minor disk bulging at L5-S1 (AR 391). Dr. Ward's impression was that Plaintiff had mechanical back pain, possibly on a diskogenic basis, and that surgery was not recommended (AR 391). He recommended that Plaintiff stay active, keep her weight down, take a mild anti-inflammatory medication, and consider chiropractic or physical therapy (AR 391).

When Plaintiff returned to Dr. Duterte on July 31, 2009, she reported that the increased Abilify dosage calmed her but made her feel "spaced out," and she continued to have "a lot of problems" with mood swings (AR 258). Plaintiff stated that she still had many bad days where she was depressed and tearful (AR 258). She further stated that she had fleeting suicidal thoughts during the previous week (AR 258). Dr. Duterte reported that Plaintiff appeared "quite anxious" on mental status examination, and her affect was dysphoric and tearful (AR 258). She found that Plaintiff's thought processes were fairly coherent and organized, and she denied having any hallucinations, paranoia or delusions, and her cognition was intact (AR 258). Her insight and judgment were fair and her impulse control continued to improve (AR 258). Dr. Duterte decreased her Abilify dosage, started her on Celexa, and assessed her with a GAF score of 60 to 65 (AR 259).

Plaintiff returned to Dr. Zelen on August 5, 2009 and reported no difficulties in motor strength, gait, sensation, level of consciousness, memory, concentration, mood, affect or general thought processes (AR 398). Plaintiff further denied any headaches, speech difficulties, dizziness or problems with balance (AR 398). On physical examination, Dr. Zelen found Plaintiff was in no acute distress, but she had 1+ pitting edema below her knees (AR 399). He increased her Labetalol dosage, and counseled her regarding weight control and regular exercise (AR 399).

Plaintiff returned to Dr. Morris on August 20, 2009 and reported increased back pain (AR 469). Dr. Morris found Plaintiff had a decreased range of motion on physical examination and prescribed Vicodin (AR 469-470).

On August 31, 2009, Plaintiff reported to Dr. Duterte that she was having difficulty controlling her anger and that she had hit her husband "quite a bit" (AR 256). On mental status

examination, Plaintiff described her mood as "bad" and Dr. Duterte found that her affect was dysphoric, anxious, and tearful, and reported that she "did not look good" (AR 256).  Her thought processes and cognition were intact and she had no suicidal thoughts (AR 256-257).  Dr. Duterte further found that she had fair insight and judgment and poor impulse control (AR 257).  She was diagnosed with bipolar disorder type II and assigned a GAF score of 55 to 60 (AR 257).  Dr. Duterte continued her on Celexa, discontinued the Abilify and started her on Depakote (AR 257).

When seen by Dr. Duterte on September 22, 2009, Plaintiff reported decreased mood swings and improvement in her sleep (AR 254).  She further reported, however, increased depression with associated crying episodes (AR 254).  Dr. Duterte found that her affect was calmer and her impulse control was "a little better" (AR 254).  Her remaining examination remained the same and she was assigned a GAF score of 60 (AR 254).  She was continued on Depakote, her Celexa dosage was increased, and Visteril was added for her anxiety symptoms (AR 255).

On September 24, 2009, Plaintiff was seen by Mark Quintero, M.D., at the UPMC Horizon Pain Management Center for evaluation of her back pain (AR 471-473).  On physical examination, Dr. Quintero found some tenderness to palpation in Plaintiff's right sacroiliac joint, axial lumbar spine, and lumbar paraspinal muscles (AR 471).  Her strength, sensation to light touch and deep tendon reflexes were all intact in her lower extremities (AR 472).  Dr. Quintero recommended a TENS unit since Plaintiff reported that she had obtained "significant relief" when she had used it in the past (AR 472).

On September 29, 2009, Plaintiff was seen by Renato Ramirez, M.D., a primary care physician, after Dr. Morris relocated (AR 440).  Plaintiff reported a history of bipolar disorder, fibromyalgia, high blood pressure, and back pain (AR 440).  Plaintiff presented for pain management of her back pain and requested Vicodin (AR 440; 443).  On physical examination, Dr. Ramirez reported that Plaintiff was "very high strung and easily affected" (AR 439).  He further reported that Plaintiff was "in tears" and had a "very sensitive mood," and easily "flare[d] up" at words "that [were] not acceptable to her" (AR 439).  Dr. Ramirez found her blood

pressure "strikingly high" (AR 439).  Her musculoskeletal examination revealed no significant findings except for some scoliosis, and she had positive pressure points at fourteen areas (AR 439).  He assessed her with, *inter alia*, scoliosis with chronic back pain, "some bipolar personality" and fibromyalgia (AR 439).  He increased her Elavil dosage and prescribed Vicodin (AR 439).

Plaintiff returned to Dr. Ramirez on October 9, 2009, who found no significant change in her physical examination (AR 440).  Plaintiff was also seen by Dr. Duterte on the same date, and reported that she experienced "more incidents" of violence directed towards her husband (AR 266).  Plaintiff reported that she had taken two Vistaril that day, but claimed it had not helped her symptoms (AR 266).  Her medication was changed to Risperdal and she was instructed to present to the emergency room if her symptoms worsened (AR 266).

Plaintiff returned to Dr. Duterte on October 21, 2009 and reported doing "a lot better" since she stopped taking Depakote and started taking Risperdal (AR 252).  She indicated that she had not had any violent episodes in the previous one and one half weeks (AR 252).  She also reported that Vistaril had helped calm her symptoms, but she continued to experience some anxiety episodes (AR 252).  Plaintiff described her mood as "okay," and Dr. Duterte found she had a "bright" affect, and that her impulse control was "getting better" (AR 253).  Her remaining mental status examination remained unchanged (AR 253).  Dr. Duterte diagnosed her with bipolar disorder type II, assigned her a GAF score of 65, and continued her medication regimen (AR 253).

On October 27, 2009, Dr. Ramirez noted that Plaintiff's blood pressure was elevated, and that she had a liver and uterine mass that needed to be evaluated (AR 438).[5]  On physical examination, Dr. Ramirez reported that Plaintiff was depressed and tearful, but found the remainder of her examination was "unremarkable" (AR 438).  She was continued on her medication regimen and referred to an endocrinologist and a tumor specialist (AR 438).

On November 24, 2009, Kathy Cerra, M.A., from Action Review Group, Inc., prepared a "Vocational Report" (AR 459-463).  After reviewing Plaintiff's medical records, Ms. Cerra

---

[5] Diagnostic studies in October 2009 revealed a left adrenal adenoma and a right lobe liver mass (AR 450-451).

concluded that Plaintiff was unable to perform any substantial gainful activity (AR 462).  Ms.

Cerra found that Plaintiff's psychological symptomotology severely limited her in performing

tasks of daily living, as well as work-related activities, observing:

> … Ms. Martinez, even in her home setting, has experienced difficulties in
> sustaining attention and concentration for extended periods of time, working at a
> consistent pace, sustaining a routine, attending to a task from beginning to end, or
> working within customary tolerances.  This is evidenced by her sporadic work
> history, and inability to seek or maintain employment since 2005.  Additionally,
> she has become a highly dependent individual, and based upon her difficulties,
> would be unable to make simple work-related decisions independently of others.
> Even in her home setting, she requires a great deal of assistance from her
> husband, and even needs reminders in regard to medication administration.  Ms.
> Martinez would be unable to complete a full workday or workweek without
> interruptions from her psychologically based symptoms, and would require
> frequent and lengthy rest periods.  If employed, she would have frequent
> absences, which would lead to termination in employment.  … It is in this writer's
> professional opinion that Ms. Martinez's prognosis is poor at the present time,
> based upon the severity and chronicity of her psychiatric dysfunction, her need for
> continued psychiatric care and compliance with prescribed medication and
> treatment, as well as medical follow up regarding her multitude of medical
> concerns and resulting limitations.  Ms. Martinez is clearly an individual who is
> unable to perform the basic work-related functions, therefore, meeting the severity
> criteria as defined by Social Security Rules and Regulations.

(AR 462).

Attached to Ms. Cerra's report was a form styled "Medical Review Team Disability

Certification" dated November 22, 2009 (AR 466).  On this form, Ronald Refice, Ph.D., found

that Plaintiff's mental impairment met the requirements of Listing 12.04 (Affective Disorders)

(AR 466).  Specifically, Dr. Refice found that Plaintiff had marked difficulties in maintaining

social functioning and had repeated episodes of decompensation, each of an extended duration

(AR 466).  He concluded that Plaintiff's frequent and extreme mood lability precluded

persistence and pace, and that her violent outbursts would interfere with her ability to relate to

supervisors and coworkers (AR 466).

Plaintiff and Samuel Edelmann, a vocational expert, testified at the hearing held by the

ALJ on June 16, 2010 (AR 29-56).  Plaintiff testified that she was a high school graduate and had

13

attended a technical school for business administration for one and one-half years (AR 34).  She stated she performed well in technical school but had not completed the two year program because she had not liked the separation from her parents (AR 34-35).  Plaintiff testified that she previously worked as a cashier/stocker and paper/telephone delivery person for a short period of time, and had also worked several different positions at a plastics company for six years (AR 36-38).  She stated that she lived with her husband and three children, ages eight, six and four (AR 332).  Plaintiff indicated that she took medications for her hypertension, bipolar disorder and back pain, which caused drowsiness (AR 41).  Plaintiff claimed she also suffered from sleep disturbances (AR 42).  Plaintiff testified that she experienced angry "outbursts" directed at her husband, family, friends and health care providers (AR 43; 50-51).  She further testified that at times she felt like she was "not in control" which caused her to strike her husband (AR 43).  Plaintiff stated that she had trouble concentrating and avoided family get-togethers (AR 42; 50).  Plaintiff further testified that she suffered from back pain and had recently been referred to a methadone clinic due to excessive Vicodin usage (AR 44).  She rated her pain as "usually" between a six and seven and claimed that at times it was a ten (AR 45).  Plaintiff stated that she needed to lie down once or twice during the day to alleviate her pain (AR 45).  She indicated that she was able to drive to appointments and grocery shop with her husband, and her oldest child helped with the younger children (AR 45-46; 48).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to lift and carry 20 pounds occasionally and 10 pounds frequently; was limited to standing for no more than two hours a day and sitting for six hours a day; could perform postural maneuvers occasionally; and could not be exposed to heights or hazards (AR 53).  He was further asked to assume that the individual would be limited to simple, routine, repetitive tasks with minimal, if any, interaction with the public and coworkers (AR 53).  The vocational expert testified that such an individual could perform the jobs of an assembler, packer and sorter/grader (AR 54).

Following the hearing, the ALJ issued a written decision finding that Plaintiff was not entitled to a period of disability or DIB within the meaning of the Act (AR 16-25).  Her request

for an appeal with the Appeals Council was denied, rendering the ALJ's decision the final decision of the Commissioner (AR 1-5).  She subsequently filed this action.

### III.   STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood,* 487 U.S. 552, 564-65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995).  It has been defined as less than a preponderance of evidence but more than a mere scintilla.  *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).  Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.  A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record.  *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings.").  To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole.  *See* 5 U.S.C. § 706.

### IV.   DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner uses a five-step evaluation process to determine when an

15

individual meets this definition.  20 C.F.R. § 404.1520.  The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. § 404.1520(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy.  *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

The ALJ concluded that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, affective disorder, migraine headaches, and status post gastric by-pass surgery, but determined at step three that she did not meet a listing (AR 18-19).  The ALJ described the Plaintiff's residual functional capacity as follows:

> …[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). …
>
> Specifically, the evidence supports that the claimant is capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting at least six hours out of eight and standing and/or walking six hours during an 8-hour workday.  Occasionally, the claimant can perform postural activities requiring the ability to climb, balance, stoop, kneel, c[r]ouch and crawl; however, she must avoid working at heights or around hazards.  The claimant can perform simple, routine, repetitive tasks with no more than minimal interaction with co-worker's (*sic*) and the general public.

(AR 20).  At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 24-25).  Again, we must affirm this determination unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

16

Plaintiff argues that the ALJ erred at the third stage of the sequential evaluation process by concluding that her degenerative disc disease of the lumbar spine failed to meet Listing 1.04 of the listed impairments as set forth in 20 C.F.R. Pt. 404. Subpt. P, App. 1.  *See* [ECF No. 10] pp. 11-12.  In order to meet Listing 1.04, a claimant must have a disorder of the spine resulting in compromise of the nerve root with: 1) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); 2) confirmed spinal arachnoiditis; or 3) lumbar spinal stenosis with pseudoclaudication, established by imaging and manifested by chronic pain and weakness and resulting in the inability to ambulate effectively.[6]  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04.

The ALJ found that while Plaintiff's degenerative disc disease of the lumbar spine was a severe impairment, the medical evidence failed to support nerve root compression, spinal arachnoiditis or lumbar spinal stenosis resulting in the inability to ambulate effectively as defined in the Listing (AR 18).  In support of her contention that her degenerative disc disease met the Listing, Plaintiff relies on her diagnostic studies revealing a disc herniation at the L5-S1 level with some mild effect on the left S1 traversing nerve root, and Dr. Colantonio's diagnosis of lumbar radiculopathy on March 21, 2008.  *See* [ECF No. 10] p. 12.  However, "[f]or a claimant to show that an impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (emphasis in original); *see also Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992).

Here, the evidence does not support a finding that Plaintiff met all the requirements of 1.04A because the record is devoid of any evidence demonstrating a limitation of motion of the spine and motor loss accompanied by sensory or reflex loss, and a positive straight-leg raising

---

[6] The inability to ambulate effectively means "an extreme limitation of the ability to walk, i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning … to permit independent ambulation without the use of handheld assistive device(s) that limits functioning of both upper extremities."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00b(1).

test.  When examined by Ms. Searls from Dr. Colantonio's office on March 21, 2008, Plaintiff's sensory reflexes and motor strength were found to be normal (AR 202).  On May 4, 2009 Dr. Morris found Plaintiff's strength in her lower extremities to be 5/5 bilaterally (AR 275).  On June 8, 2009, Dr. Morris reported that Plaintiff's sensation was equal to pin prick and her reflexes were intact (AR 316).  On July 24, 2009, Dr. Ward, the orthopedic surgeon, found that Plaintiff had normal motor, sensory, and reflex examinations (AR 391).  When evaluated by Dr. Quintero on September 24, 2009, Plaintiff's strength, sensation to light touch, and deep tendon reflexes were all intact in her lower extremities (AR 472).  Dr. Ramirez found no significant findings on physical examination on September 29, 2009 and October 9, 2009 (AR 439-440).  On October 27, 2009, Dr. Ramirez reported that Plaintiff's physical examination was "unremarkable" (AR 438).  Further, the results of Plaintiff's straight-leg raising tests conducted on March 21, 2008 by Ms. Searls and on July 24, 2009 by Dr. Ward were both reported as negative bilaterally (AR 202; 391).

In addition, there is no evidence of confirmed spinal arachnoiditis as required to meet 1.04B, and Plaintiff concedes that the diagnostic studies reveal no evidence of lumbar spinal stenosis resulting in an inability to ambulate effectively in order to satisfy the requirements of 1.04C.  *See* [ECF No. 10] p. 11.  Accordingly, because the Plaintiff failed to demonstrate that her degenerative disc disease met or equaled all of the specified criteria of Listing 1.04A, B or C, we find that the ALJ's step three determination is supported by substantial evidence.  *See Garrett v. Comm'r of Soc. Sec.*, 274 Fed. Appx. 159, 162-63 (3d Cir. 2008); *Johnson v. Comm'r of Soc. Sec.*, 263 Fed. Appx. 199, 202-03 (3d Cir. 2008).

Plaintiff further argues that the ALJ improperly rejected Dr. Morris' opinion that she was precluded from sitting for more than two hours a day.  *See* [ECF No. 10] pp. 12-13.  It is well settled that the opinion of a treating physician is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. § 404.1527(d)(2).  Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so.  *See Sykes v.*

*Apfel*, 228 F.3d 259, 266 (3d Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."); *Cotter*, 642 F.2d at 705-07.

In assigning Dr. Morris' assessment "minimal weight" with respect to her sitting limitations, the ALJ concluded that it was contradicted by the medical evidence and Plaintiff's daily activities (AR 22). In this regard, the ALJ stated:

> … Although the treating physician limits the claimant to only two hours of sitting per day, this is contradicted by the claimant's activities of daily living as well as the current medical evidence. Treatment evidence supports no lower extremity pain and only occasional numbness of the lower extremities, but nothing very significant or constant. Further, the evidence supports normal motor, sensory and reflex of the lower extremities and negative straight leg raising. It was further noted that the claimant has only mechanical back pain and no surgical intervention has been recommended (Ex. 4F, 5F, 6F, 7F, 11F and 16F).

(AR 23). The ALJ further found that Plaintiff had not required surgical intervention, and observed that she functioned as a caregiver for her children, managed her personal care, shopped with her husband, and drove independently in the community (AR 23). Finally, the ALJ relied on the opinion of Dr. Mortimer, the state agency reviewing physician, who concluded that Plaintiff could perform light work with occasional postural movements, but should avoid machinery and heights (AR 313-314).

The ALJ's findings with respect to the Plaintiff's physical limitations are supported by substantial evidence and accordingly, we find no error in this regard.

We reach a different conclusion with respect to the ALJ's evaluation of the medical evidence relative to the Plaintiff's mental impairments. Plaintiff argues that the ALJ erred in his evaluation of the medical evidence by failing to discuss the records of her treating psychiatrist, Dr. Duterte, found at Exhibit 3F of the administrative record. *See* [ECF No. 10] pp. 6-9. In evaluating a claim for benefits, the ALJ must consider all the evidence in the case. *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999). The Third Circuit has also directed that "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence," *Dobrowolsky v. Califano*, 606 F.2 403, 407 (3d Cir. 1979), and "adequately explain in the record

his reasons for rejecting or discrediting competent evidence." *Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000). Without this type of explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705-07 (3d Cir. 1981); *see also Plummer*, 186 F.3d at 429 (ALJ must give some reason for discounting the evidence he rejects).

In concluding that Plaintiff had the mental residual functional capacity ("RFC")[7] to perform simple, routine, repetitive work with no more than minimal interaction with coworkers and the general public, the ALJ stated the following:

> All treating sources have been considered and there is no detailed, clinical and/or diagnostic evidence in the case record to support work disabling limitations as alleged. The claimant has not required surgical intervention or inpatient psychiatric hospitalization. As previously indicated, the claimant functions as a caregiver for her children, manages her personal care, shops with her husband and drives independently in the community. While she indicates that she has lost some jobs due to her temper and outbursts, there are only fleeting references to this problem in the record and nothing to support a finding that her outbursts are uncontrollable or unmanageable. Clearly, the limitation on minimal interaction with the public and co-worker's will accommodate any problems in this area. In addition, the medical evidence fails to support worsening of symptoms and there is no indication of adverse medication side effects, which would impair the claimant's ability to work.

(AR 23-24).

A review of the ALJ's decision reveals however, that he failed to discuss the treatment notes of Dr. Duterte, Plaintiff's treating psychiatrist. As previously discussed, Plaintiff was treated by Dr. Duterte for her mental health impairments following her January 2009 hospitalization and was seen by her on approximately nine occasions from March 5, 2009 through October 21, 2009 (AR 252-269). A review of this evidence reveals repeated references to uncontrolled outbursts, rather than only "fleeting references" in the record, as found by the

---

[7] "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3rd Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2).

ALJ.  For example, on March 5, 2009, Plaintiff reported mood instability and angry outbursts where she injured herself in order to avoid injuring others, and Dr. Duterte found her impulse control was "poor" (AR 267).  On April 24, 2009 Plaintiff again reported mood instability and angry outbursts (AR 264).  Dr. Duterte found Plaintiff's affect to be dysphoric and her impulse control was "poor" (AR 264).  Although Plaintiff reported a decrease in her outbursts on May 29, 2009, she was still experiencing "anger episodes" when seen on June 29, 2009 (AR 260).  On July 31, 2009, Plaintiff reported continuing problems with mood swings, and Dr. Duterte found that she was "quite anxious" (AR 258).  On August 31, 2009, Plaintiff reported that her anger outbursts were "out of control" causing her to hit her husband "quite a bit" (AR 256).  Dr. Duterte found Plaintiff's affect to be dysphoric, anxious and tearful, and further found that she "did not look good" and had "poor" impulse control (AR 256-257).

We also observe that the ALJ failed to discuss additional medical evidence arguably supportive of the Plaintiff's claim that her outbursts remained uncontrolled during the relevant period.  For example, on May 4, 2009, Plaintiff reported to Dr. Morris that she had an "episode" wherein she became angry at her husband for no reason, and Dr. Morris found she was tearful and anxious (AR 275).  On June 8, 2009, Plaintiff reported to Dr. Morris that she had "punched [her] husband" and Dr. Morris found she was depressed (AR 272).  When Plaintiff was seen by Dr. Ramirez on September 29, 2009, Dr. Ramirez reported witnessing an outburst, noting that Plaintiff "flare[d] up" during her office visit with him (AR 439).

In light of the ALJ's failure to have addressed the previously described medical evidence, the ALJ is directed to address this evidence on remand consistent with *Cotter*.

In a related argument, Plaintiff challenges the ALJ's decision to reject the vocational report of Ms. Cerra and Dr. Refice on the grounds that it was not consistent with the overall evidence of record.  *See* [ECF No. 10] pp. 9-11.  In light of our finding that the ALJ failed to evaluate all the pertinent medical evidence relative to Plaintiff's mental impairment, it follows that the ALJ's rejection of this report cannot stand.  On remand, the ALJ is directed to reconsider the weight to be accorded this report following his evaluation of all the medical evidence relating to Plaintiff's mental impairment.

## V.   CONCLUSION

For the reasons discussed above, both motions will be denied and the matter will be remanded to the Commissioner for further proceedings.[8]   An appropriate Order follows.

---

[8] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issue addressed in this Memorandum Opinion.  *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3rd Cir. 2010).

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KATY L. MUNOZ MARTINEZ,     )
                             )
               Plaintiff,      )       Civil Action No. 12-18 Erie
                             )
     v.                      )
                             )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security,  )
                             )
            Defendant.    )

## <u>ORDER</u>

AND NOW, this 3rd day of January, 2013, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [ECF. No. 9] is DENIED, and the Defendant's Motion for Summary Judgment [ECF No. 11] is DENIED.  The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is directed to mark the case closed.

                                            s/ Sean J. McLaughlin
                                             United States District Judge

cm:    All parties of record